IN THE UNITED STATES DISTRICT COURT   FILED

FOR THE WESTERN DISTRICT OF TEXAS      PM 12:55

EL PASO DIVISION

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
            DEPUTY

| | | |
|---|---|---|
| EDUARDO DE LA ROSA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO.  EP-10-CV-351-RPM |
| | § | |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This is a civil action seeking judicial review of an administrative decision.  Jurisdiction is predicated upon 42 U.S.C. § 405(g).  Both parties consented to trial on the merits before a United States Magistrate Judge.  The case was transferred to this Court for trial and entry of judgment pursuant to 28 U.S.C. § 636(c) and Appendix C to the Local Court Rules.

Plaintiff EDUARDO DE LA ROSA appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for benefits on the ground that he is not disabled within the meaning of the Social Security Act.  After considering the briefs, the record evidence, the transcript of the administrative hearing and the written decision of the Administrative Law Judge ("ALJ"), the Court finds the final decision of the Commissioner should be AFFIRMED.

1

<u>BACKGROUND</u>

Plaintiff was born on June 23, 1953, making him 55 years old at the time of the ALJ's decision. (R. 111, 17, 19).[1] He attended school through the sixth grade in Mexico. (R. 28). He also attended English classes at a high school in the United States. *Id.* He can communicate in English, however, he preferred the hearing be conducted with the use of a Spanish language interpreter. (R. 22, 23, 29). He has previous work experience as an electrician helper. (R. 41). He testified he can no longer work due to mental problems, diabetes, problems with his hands and feet, and liver problems. (R. 35-36 ).

<u>PROCEDURAL HISTORY</u>

On June 27, 2006, Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") in which he alleged disability since May 14, 2004, due to major depression, diabetes and hypertension. (R. 111-119, 131). On August 25, 2006, his applications were denied. (R. 50-59). He requested reconsideration and was denied again on November 17, 2006. (R. 65-70). On May 6, 2008, Plaintiff appeared with his attorney for an administrative hearing. (R. 20-45). At the hearing, Plaintiff amended his alleged disability onset date to January 15, 2005. (R. 36).

The ALJ's written decision was issued on October 24, 2008. (R. 7-15). Therein, the ALJ determined Plaintiff became disabled on June 23, 2008, but was not disabled prior to that date. (R. 18). On July 22, 2010, the Appeals Council denied Plaintiff's request to review the ALJ's decision, thereby making it the final decision of the Commissioner. (R. 1-4).

On September 23, 2010, Plaintiff filed a motion to proceed in forma pauperis with the filing

---

[1] Reference to the transcript of the record of administrative proceedings filed in this case, (Doc. 18), is designated by "R." followed by the page numbers.

of his complaint seeking judicial review of the administrative decision. (Doc. 1). On September 24, 2010, Plaintiff's motion to proceed in forma pauperis was granted, and his complaint was filed. (Docs. 5 & 6). On November 30, 2010, Defendant filed an answer. (Doc. 15). On December 1, 2010, a transcript of the administrative proceedings was filed. (Doc. 18). The following day, the District Judge entered an order transferring the case to the undersigned for all proceedings. (Doc. 19). On March 10, 2011, Plaintiff filed his brief in support of reversing the Commissioner's decision and remanding for an award of benefits or, alternatively, for additional administrative proceedings. (Doc. 27). On April 19, 2011, the Commissioner's brief was filed. (Doc. 30). This matter is now ripe for decision.

DISCUSSION

A. Standard of Review

      This Court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence on the record as a whole, and whether the proper legal standards were applied in evaluating the evidence. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001), citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995). Substantial evidence is more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

      In applying the substantial evidence standard, a court must carefully examine the entire record, but may not reweigh the evidence or try the issues de novo. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989). It may not substitute its own judgment "even if the evidence preponderates against the Secretary's decision" because substantial

3

evidence is less than a preponderance.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

Conflicts in the evidence are for the Commissioner and not the courts to resolve. *Spellman v. Shalala*,

1 F.3d 357, 360 (5th Cir. 1993).  A finding of "no substantial evidence" will be made only where

there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Abshire v.*

*Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  If the Commissioner's findings are supported by

substantial evidence, they are conclusive and must be affirmed. *Spellman v. Shalala*, 1 F.3d at 360.

<u>B. Evaluation Process and Burden of Proof</u>

An individual applying for benefits bears the initial burden of proving that he is disabled for

purposes of the Social Security Act.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  A

disability is defined as a medically determinable physical or mental impairment lasting at least 12

months that prevents the individual from engaging in substantial gainful activity.  42 U.S.C.A. §

423(d)(1)(A) (West Supp. 2011); 20 C.F.R. §§ 404.1505(a) & 416.905(a) (2011).  Substantial gainful

activity is defined as work activity involving the use of significant physical or mental abilities for pay

or profit.  20 C.F.R. §§ 404.1572(a)-(b) &  416.972(a)-(b) (2011).

Disability claims are to be evaluated according to a five-step sequential process.  20 C.F.R.

§§ 404.1520(a) &  416.920(a) (2011).  A finding that a claimant is disabled or not disabled at any

point in the process is conclusive and terminates the analysis. *Greenspan v. Shalala*, 38 F.3d at 236.

In the first step, it is determined whether the claimant is currently engaged in substantial gainful

activity.  20 C.F.R. §§ 404.1520(a)(4)(i) &  416.920(a)(4)(i) (2011).  If so, the claimant is found not

disabled regardless of his medical condition or his age, education and work experience.  *Id.*

In the second step, it is determined whether the claimant's impairment is severe.  20 C.F.R.

§§ 404.1520(a)(4)(ii) &  416.920(a)(4)(ii) (2011).   If the impairment is not severe, the claimant is

deemed not disabled. *Id.* If the impairment is severe and meets the duration requirement, the third step of the evaluation directs that the impairment be compared to a list of specific impairments in Appendix 1 to Subpart P of Part 404 of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii) (2011). If the claimant's impairment meets or equals a listed impairment, he is deemed disabled without considering his age, education or work experience. *Id.*

If the impairment is not on the list of specific impairments in Appendix 1, the fourth step requires a review of the claimant's residual functional capacity ("RFC") and the demands of his past work. 20 C.F.R. §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv) (2011). If he can still do this kind of work, he is not disabled. *Id.* If he cannot perform his past work, the fifth and final step evaluates the claimant's ability, given his RFC and his age, education and work experience, to do other work. 20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v) (2011). If he cannot do other work, he will be found to be disabled. *Id.*

The claimant bears the burden of proof on the first four steps of the sequential analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Once this burden is met, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is capable of performing. *Anderson v. Sullivan*, 887 F.2d 630, 632 (5th Cir. 1989). The Commissioner may meet this burden by the use of opinion testimony of vocational experts or by the use of administrative guidelines provided in the form of regulations. *Rivers v. Schweiker*, 684 F.2d 1144, 1155 (5th Cir. 1982). If the Commissioner adequately points to potential alternative employment, the burden then shifts back to the claimant to prove that he is unable to perform the alternative work. *Anderson v. Sullivan*, 887 F.2d at 632.

C. The ALJ's Decision

In his written decision, the ALJ noted Plaintiff had filed prior applications for disability benefits that were denied at the hearing level on May 14, 2004. (R. 12). The pending applications for DIB and SSI alleged disability beginning on May 15, 2004. *Id.* At the outset of the hearing, however, Plaintiff amended his onset date to January 15, 2005. *Id.*

As a preliminary matter, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2005. (R. 14). At the first step, the ALJ determined Plaintiff had not engaged in substantial gainful activity since May 15, 2004, the original alleged onset date.[2] *Id.* The ALJ noted Plaintiff testified he stopped working in November 2004 when he was laid off because his employer's contract was finished. *Id.*

At the second step, the ALJ determined Plaintiff has severe impairments consisting of diabetes mellitus and major depression. *Id.* At step three, the ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-15). Specifically, the ALJ found Plaintiff's diabetes had not imposed any of the complications specified in section 9.08 of the Listings. *Id.* The ALJ also determined that under Listing 12.04, Plaintiff's depression did not result in any marked or extreme limitations under the "B" criteria, and no "C" criteria were fulfilled. *Id.*

At step four, the ALJ determined Plaintiff retained the RFC to perform a range of medium work,[3] with an ability to understand, remember and carry out detailed, but not complex, instructions;

---

[2] The ALJ referenced the originally alleged onset date of May 15, 2004, rather than the amended onset date of January 15, 2005. (R. 12, 14).

[3] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he can also do

make decisions; attend and concentrate for extended periods; adequately accept instructions; and, respond appropriately to changes in a routine work setting. (R. 15-16). Based on this RFC, the ALJ concluded Plaintiff was unable to perform his past relevant work which was at the heavy exertional level. (R. 16).

At the fifth step, the ALJ found that on the alleged onset date of disability,[4] Plaintiff was fifty years old which is defined in the regulations as an individual "closely approaching advanced age." (R. 17). However, on June 23, 2008, the date of Plaintiff's fifty-fifth birthday, his age category changed to an individual of "advanced age." *Id.* The ALJ found Plaintiff has a limited education, is unable to communicate in English, and has no transferable job skills. *Id.* Relying on the testimony of a vocational expert, the ALJ found that, prior to June 23, 2008, Plaintiff retained the RFC to perform other jobs in the national economy, including linen room attendant, laundry worker and hand packer. (R. 17-18). However, beginning on June 23, 2008, there were no longer a significant number of jobs in the national economy that Plaintiff could perform. (R. 18). Accordingly, the ALJ concluded Plaintiff was not disabled prior to June 23, 2008, but became disabled on that date. *Id.*

D. Claims Presented

Plaintiff raises two grounds of error. He contends: (1) the ALJ's mental RFC finding is not supported by substantial evidence; and, (2) the ALJ failed to evaluate and consider the severity and limiting effects of Plaintiff's diabetic neuropathy. Plaintiff requests that the Court reverse the Commissioner's decision that he is not entitled to benefits, and remand for an award of benefits, or

---

sedentary and light work. 20 C.F.R. §§ 404.1567(c) & 416.967(c) (2011).

[4] It appears the ALJ is referring to the originally alleged onset date of May 15, 2004, rather than the amended onset date of January 15, 2005. (R. 12, 14, 17).

alternatively, for further administrative proceedings.

E. Evidence Relevant to Claims

    1. Testimony at the Administrative Hearing

       On May 6, 2008, an administrative hearing was held. (R. 20-45). Plaintiff appeared, represented by his attorney, and testified through a Spanish language interpreter to the following. He was born on June 23, 1953. (R. 25). He stands 5 feet, 11 inches tall and weighs about 178 pounds. *Id.* He lost about 20 pounds over a period of four to five months due to diabetes. (R. 25-26).

       Plaintiff lost his driver's license about six to nine years ago following a citation for driving under the influence. (R. 26-27). He testified he did not have the $500 it would cost to get his driver's license back. (R. 27). His wife or his children drive him to the places that he needs to go. (R. 27-28). He sometimes takes the bus, but it takes too long and requires that he wait for two hours for his bus. (R. 28). Plaintiff's wife drove him to the hearing. (R. 27). The trip took about 45 minutes, and no stops were made along the way.

       Plaintiff attended school through the sixth grade in Mexico. (R. 28). He also attended English classes at a high school in the United States. *Id.* He speaks and understands basic English, particularly vocabulary related to his past work as an electrician, but he cannot carry on a conversation in English. (R. 29). He last worked for about a year in 2004 as an electrical helper until he was laid off in November of 2004. (R. 29-30). He worked from 40 to 48 hours per week, sometimes including Sundays, and was paid $10.00 per hour. (R. 30).[5]

       After Plaintiff was laid off in 2004, he "started getting sicker and sicker." *Id.* For about a

---

    [5] At this point in the hearing, a discussion took place between the ALJ and Plaintiff's counsel regarding earnings of $1340 reported for 2004 as that amount did not comport with Plaintiff's testimony. (R. 30-31).

month and a half, he applied for other jobs as an electrician helper, but he stopped looking for work because he was too nervous to drive, couldn't always get a ride and was no longer able to perform his job as before. (R. 31-34).   Under questioning by the ALJ, Plaintiff explained that he did not collect unemployment after he was laid off. (R. 34).  Prior to being laid off in 2004, Plaintiff worked on a construction job where he was paid cash. *Id.* When that job ended, he was out of work for about a year. *Id.*

Plaintiff testified he can no longer work because his "mind doesn't work the same way anymore." (R. 35). He also has complications from diabetes that affect his feet, making it difficult for him to walk. *Id.* He is unable to climb stairs. *Id.* He has problems with his hands. *Id.* He has been told by his doctor that his liver may be affected by all the medications he has to take. (R. 35-36).

Plaintiff's attorney moved to amend the alleged onset date to January 15, 2005, based on Plaintiff's testimony of working up until November 2004 and looking for work for about a month and a half after he was laid off. (R. 36). The ALJ allowed the amendment of the alleged onset date to January 15, 2005. *Id.*

Under questioning by his attorney, Plaintiff testified he is able to walk for about half of a block before he has to stop and rest. *Id.* The soles of his feet hurt the most and he gets dizzy. *Id.* Plaintiff testified he can stand for about two to two and a half hours, or possibly three hours, but with pain. (R. 37). He can sit for about 20 minutes before he has to change position. *Id.* The most he can lift is 30 pounds. *Id.* He has to lie down for 45 minutes about three times during the day. (R. 38).

Plaintiff testified his diabetes is controlled with medication. (R. 37). He also testified that his psychotropic medications help with his anxiety and depression. He stated, "It takes [away] all of the anxiety that I have." *Id.* He believes he will have to take his psychotropic medications for the rest of

his life. (R. 37-38).

In response to the ALJ's questions, Plaintiff explained his previous work as an electrician helper involved giving the journeymen the pipes and wires that were needed and doing whatever he was told to do. (R. 38). He did not have any trouble getting along with the journeymen. (R. 39). His diabetes got worse after he stopped working. He started cutting back on his alcohol consumption about two years before he started his last job. (R. 39-40). Now he sometimes drinks about two beers when he visits his children every two weeks or so. (R. 39).

Daniel Moriarty, a vocational expert ("VE"), also testified at the hearing. (R. 40). The VE stated Plaintiff's past work as an electrician helper is classified as semiskilled work performed at the heavy exertional level. (R. 41). The VE testified that an individual who can perform work at the medium exertional level could not perform Plaintiff's past relevant work. (R. 42).

The ALJ asked the VE to assume a hypothetical individual of the same age, education and work history as Plaintiff, with a limited understanding of the English language who can occasionally lift 50 pounds and frequently lift 25 pounds, stand and/or walk for up to 6 hours out of an 8 hour day, sit for up to 6 hours out of an 8 hour day, with normal breaks; and push/pull limited by the weights given for lift/carry.[6] *Id.* The ALJ asked the VE to further assume this individual can understand, remember and carry out detailed, not complex, instructions, can make decisions and concentrate for extended periods of time, get instructions, make decisions, and respond appropriately to changes in routine work settings. *Id.* Based on the hypothetical, the VE opined the hypothetical individual could perform unskilled medium exertional work, involving things rather than people, such as linen room attendant, laundry

---

[6] The transcript states the "push/pull capacities are limited as to [INAUDIBLE]." (R. 42). The Court will assume the push/pull limitation refers to the weight the hypothetical person can lift/carry, as is typical in such hypothetical questions.

worker, and hand packer. (R. 42-43). *Id.*

Plaintiff's counsel was given an opportunity to question the VE. He asked the VE to add to the hypothetical the need to take three to four unscheduled breaks during the work day to lie down for up to 45 minutes each time. (R. 44). The VE opined that such a limitation would eliminate all jobs. *Id.*

The ALJ sought clarification from Plaintiff and his counsel regarding which doctor had signed the note on the medical prescription pad that stated Plaintiff was 100 per cent totally and permanently disabled. (R. 43). Plaintiff indicated it was Dr. Luna, who was the only doctor Plaintiff saw at the San Vicente Clinic. (R. 43-44). Prior to concluding the hearing, the ALJ commented that Plaintiff had been "sitting there" for approximately an hour during the hearing. (R. 44). He then offered Plaintiff an opportunity to add anything else he wanted the ALJ to know. *Id.* Plaintiff responded that the mental clinic had also found him disabled. *Id.*

### 2. Summary of Medical Evidence

Plaintiff was seen at San Vicente Clinic on November 13, 2002. (R. 322-325). His physical examination was normal. The assessment was type 2 diabetes mellitus, depression, hypertension and erectile dysfunction, secondary to psychiatric medication.

Treatment notes from El Paso Mental Health/Mental Retardation ("EPMHMR") indicate Plaintiff reported his depression was stable on January 23, 2003. (R. 518-519). He was referred to San Vicente Clinic for complaints of headaches dizziness, and uncontrolled hypertension and diabetes. His medication was changed from Celexa to Lexapro and Clonazepam. He was to be reassessed in two months.

Plaintiff was seen again at EPMHMR on March 20, 2003. He reported Lexapro helped with his depression. (R. 516-517). On May 6, 2003, he returned for prescription refills. He reported

moderate anxiety and depression that was more stable. (R. 464). On May 28, 2003, he reported he was feeling better. He denied any major symptoms of depression. He was to continue with his medications. (R. 514-515).

An EPMHMR progress note dated June 11, 2003, from the Benefits Assistance Program states several unsuccessful attempts were made to contact Plaintiff with regard to the denial of his Social Security application on March 18, 2003. (R. 463). A letter was sent directing Plaintiff to respond by May 12, 2003, if he wished to request a hearing before an ALJ. No contact was made, and Plaintiff's benefits case was closed due to non-compliance.

Plaintiff returned to San Vicente Clinic on June 30, 2003. (R. 320-321). Medications were prescribed for diabetes and hypertension. A history of alcohol abuse was noted.

On October 14, 2003, Plaintiff was seen at EPMHMR. He reported his symptoms to be at the lowest level and stated he had been stable without any signs of depression. (R. 512-513). A progress note dated October 15, 2003, indicates Plaintiff was taking his medications and denied any depressive or psychiatric symptoms.

On December 9, 2003, Plaintiff rated his psychiatric symptoms at 9 on a scale with 10 being the least. (R. 510-511). He was to return to EPMHMR in two months.

According to the records, Plaintiff was not seen again at EPMHMR until April 20, 2004. (R. 460). At that time, he reported doing well on his current medications. He denied any psychiatric or depressive symptoms.

Notes from San Vicente Clinic dated July 19, 2004, indicate Plaintiff had not taken his medications for a few days. (R. 297).

On July 26, 2004, Plaintiff was seen at EPMHMR. (R. 458). He requested a letter to provide

12

to Social Security for food stamps.  He reported doing well and taking his medications as prescribed. He had no other complaints.

A letter dated July 27, 2004, from Eugenio Chavez-Rice, M.D., at EPMHMR, states Plaintiff is currently receiving outpatient psychiatric treatment, medications and case management services, and has been receiving these services since June 6, 2001.  (R. 329). The diagnosis is major depression.

On August 19, 2004, Plaintiff called EPMHMR and stated a lack of transportation prevented him from keeping his appointment.  (R. 457).

On October 6, 2004, Plaintiff missed his appointment at San Vicente Clinic. (R. 293). He next was seen on October 21, 2004.  (R. 292).  At that time, he reported drinking five beer about three weeks earlier, and that he had stopped taking his medications about a week ago.  It was noted Plaintiff should stop using alcohol. Notes dated November 4, 2004, state Plaintiff needed a follow up and an ultrasound of his abdomen.  (R. 291).  "Stop ETOH!" [7] was  noted.

On November 9, 2004, Plaintiff was seen at the San Vicente Clinic for a complaint of a rash to both arms and behind his knees.  (R. 288-290).  Lab work was ordered, and medications were prescribed for diabetes and hypertension.  As his liver function tests ("LFTs") were high, diet and use of alcohol were discussed.   He also underwent a diabetic foot exam.  It was determined Plaintiff had no loss of protective sensation in his feet.  (R. 290).

On December 17, 2004, Plaintiff was referred by San Vicente Clinic to a gastroenterologist for evaluation related to a history of alcohol, elevated LFTs, and increased intestinal pain.  (R. 298).

On December 21, 2004, a case manager from EPMHMR attempted an unscheduled home visit.

---

[7] EtOH is an abbreviation for ethyl alcohol. http://www.medilexicon.com/medicaldictionary.php?t=30629  (last visited Mar. 29, 2012).

(R. 455).  Plaintiff was not at home.  A phone call later that day revealed the phone was disconnected. (R. 456).

An EPMHMR progress note dated December 29, 2004, shows Plaintiff stated he was feeling pretty good. (R. 265-266; 508-509).   He was eating very well and sleeping all night.  The only major problem he reported was erectile dysfunction.  He expressed a desire to try a lower dose of Lexapro to decrease the side effects.

On January 22, 2005, Plaintiff's EPMHMR case was reactivated. His GAF was rated at 50.[8] (R. 424-430).  An EPMHMR progress note dated January 31, 2005, indicated Plaintiff was in for a prescription refill. (R. 454).  He missed last appointment due to illness.  He stated he was doing well, and denied any problems.

A progress note from San Vicente Clinic dated March 8, 2005, indicates Plaintiff missed his appointment with the gastroenterologist. (R. 286).

Plaintiff had an appointment at EPMHMR on March 14, 2005. (R. 262-264; 505-507). His overall functioning was rated at 10 out of 10.  He reported no symptoms of depression.  He was given Viagra samples for erectile dysfunction and was to continue on his current medication plan.  Notes show he left the clinic after he was seen by nurse and did not meet with his case worker.  (R. 453). Attempts to contact him were unsuccessful as the phone numbers in his chart were either wrong or disconnected.  He case was to be considered for closure if no contact was made within 10 days.  (R.

---

[8] The Global Assessment of Functioning Scale is used to rate overall psychological functioning on a scale of 0 to 100.  A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).

14

452).  On April 25, 2005, Plaintiff's case was deactivated.  (R. 451).

On June 24, 2005, Plaintiff's EPMHMR case was reopened.  (R. 267-268).  At that time, he was out of medications.  He reported having symptoms of depression, but no longer having panic attacks.  He stated he had not been able to work for two and a half years due to symptoms.  He was denied Social Security benefits and is dependent on his wife's salary.  He mostly stays home and works in the yard when he feels up to it.  He was initially diagnosed by Dr. Rice with severe major depressive disorder, with anxiety and panic attacks. The assessment was major depressive disorder, recurrent.  His GAF was rated at 48.  It was determined he required rehabilitative services and ongoing treatment to establish coping skills.  He was to continue with medication and follow up appointments. (R. 237-238).

EPMHMR notes dated June 30, 2005, indicate Plaintiff had run out of medications four days earlier. (R. 259-261; 502-504).  He reported feeling well and having a good appetite. His sleep was fragmented, as he awoke three times at night. He reported no problems at home and doing well at work as an electrician.

Plaintiff met with his EPMHMR case manager on July 26, 2005. He reported experiencing depression on a daily to weekly basis. (R. 234-236). He denied having anxiety.  He was alert and oriented to his surroundings.  It was noted that he needed to improve adherence to his medication and treatment regime as he often missed appointments.

That same day, Plaintiff was seen for counseling. (R. 256-258; 499-501).  He was stable, doing well, sleeping and eating well, and reported no side effects from medication.  His overall functioning was rated at 10 out of 10. His  GAF was rated at 55. [9]  His diabetes and hypertension were reported to

---

[9] A GAF score of  51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational and school functioning (e.g., few friends, conflicts with coworkers). American Psychiatric Association,

be under control.

On August 22, 2005, Plaintiff was seen at EPMHMR.  (R. 253-255; 496-498).  He reported no symptoms and no side effects.  He exhibited no depressive symptomatology and was functioning at the highest level.  His GAF was rated at 50.

On October 5, 2005, Plaintiff was seen at San Vicente Clinic for lab results and a diabetic foot screening.  (R. 282-285; 565).  It was noted he had not seen Dr. Halow for increased liver enzymes as referred. The danger of being noncompliant was explained.  The assessment was uncontrolled diabetes, hypertension, loss of sensation to feet, and increased liver enzymes. Plaintiff accepted a prescription for Lisinopril, but refused other medications.  It was noted that his lab results were very abnormal, and he should stop alcohol.  He was referred to Dr. Velasquez for evaluation and treatment regarding complaints of loss of sensation to top two-thirds portion of both feet and uncontrolled diabetes for the past two to three years due to noncompliance.  (R. 299-301).

On October 17, 2005, Plaintiff was seen at EPMHMR.  (R. 250-252; 493-495).  He was asymptomatic and voiced no concerns.   His overall functioning was rated at 10 out of 10.

On November 2, 2005, Plaintiff was seen by Dr. Velasquez. (R. 299-300).  The assessment was diabetic neuropathy.[10]  Diabetic foot care education was given and high top supportive footwear was

------

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).

[10] Diabetic neuropathy is a peripheral nerve disorder caused by diabetes or poor blood sugar control.  The most common types result in problems with sensation in the feet. Symptoms are numbness, pain or tingling in the feet or lower legs.  The pain may be intense and require treatment to relieve the discomfort. The loss of sensation may increase the possibility that foot injuries will go unnoticed and develop into ulcers or lesions that become infected.  In some cases, it can be associated with difficulty walking and some weakness in the foot muscles.  Treatment involves bringing blood sugar levels under control and taking proper care of the feet.  Treating diabetes may halt progression and improve symptoms, but recovery is slow. http://www.ninds.nih.gov/disorders/diabetic/diabetic.htm  (last visited Mar. 29, 2012).

recommended.  Plaintiff was to undergo an MRI of his lower left extremity and return for followup.

On November 28, 2005, Plaintiff was treated at the emergency room for an injury to his right shin that occurred two weeks earlier when he fell off a bunk bed and hit a table.  (R. 196-201; 371-376).  X-rays were taken which showed a focal area of increased bony density and periosteum. New bone along the lateral posterior portion of the distal tibia indicated previous trauma.  (R. 202; 378).  He was treated and released to home.

An EPMHMR progress note dated December 21, 2005 shows Plaintiff stated he was doing well and did not have any problems to report.  (R. 241; 448).  He was oriented in all spheres with normal affect. He was pleasant and cooperative.

Plaintiff was seen at EPMHMR on January 17, 2006.  (R. 247-249; 490-492). He reported no panic attacks and no depression. He stated he had been out of medications for some time because they had been stolen.  A letter dated January 17, 2006, from Ray Leal, N.P., states Plaintiff has been receiving services from EPMHMR since June 2005 and is currently diagnosed with major depression for which medications are prescribed. (R. 328; 568).  Nurse Leal opined that Plaintiff cannot hold a position as an independent competitive employee due to the complexity and severity of his  symptoms and the side effects from his prescribed medications.

On March 7, 2006, Plaintiff was seen at San Vicente Clinic for a follow up visit that was rescheduled from a cancelled appointment on February 21, 2006.  (R. 276-278; 563-564).  Plaintiff voiced no new complaints.  He reported only occasional alcohol use.  A foot exam revealed intact sensation intact, except for the big toe and second toe of the left foot. The assessment was uncontrolled diabetes with peripheral neuropathy, suboptimal hypertension and hepatic insufficiency with possible cirrhosis likely due to alcohol.  Plaintiff was advised that he must discontinue alcohol consumption. Notes from a follow up visit on March 21, 2006, however, indicate Plaintiff was drinking alcohol daily. The assessment was uncontrolled diabetes, elevated liver function tests and hypertension. He was to

return to the clinic in three months.

On March 22, 2006, Plaintiff was seen at EPMHMR. (R. 220-226; 417-423). Notes indicate he had been without his medications for the past three days. He reported eating well, but not sleeping well. He was alert and oriented in all spheres, and his mood was neutral. His speech was fluent, eye contact was good, and his affect was appropriate. He appeared calm, pleasant and polite. He appeared to be adhering to his treatment and medication regime. His GAF was rated at 50.

On April 18, 2006, Plaintiff was seen at EPMHMR. He reported no depression and no panic attacks. He was sleeping well, and his appetite was good. His GAF was rated at 50. (R. 244-246; 487-489).

On June 16, 2006, Plaintiff met with his case manager at EPMHMR. (R. 239). Plaintiff stated he was doing much better. He was taking his medications as prescribed and tolerating them well. He was alert and oriented in all spheres, and his mood was neutral. His speech was fluent, eye contact was good, and his affect was appropriate. He appeared calm, pleasant and polite. His GAF was rated at 50. The only problem he reported was taking about an hour to fall asleep. He was given samples of Lexapro due to problems getting his prescriptions filled.

Plaintiff was seen at San Vicente Clinic on June 20, 2006, for a follow up appointment for diabetes. (R. 272-273; 559-560). It was noted that he was "still drinking." His fasting blood glucose level was 259. He complained of his feet hurting and tingling. His diabetes was noted to be poorly controlled, and his insulin dosage was increased. Neuropathy was noted. He was treated for an earache and was to return in three months.

On August 1, 2006, a Physical Residual Functional Capacity Assessment was completed by Bonnie Blacklock, M.D.  (R. 344-351). Dr. Blacklock determined Plaintiff could occasionally lift and/or carry 50 pounds and frequently lift/carry 25 pounds. It was determined he could stand and/or walk for 6 hours in a normal 8-hour workday and could sit for 6 hours in a normal 8-hour workday.

His ability to push and/or pull was unlimited, other than the amounts given for lift and/or carry.  No postural, manipulative, visual, communicative or environmental limitations were found.

Dr. Blacklock's notes indicate the medical evidence in the file showed Plaintiff had been diagnosed with poorly controlled diabetes, peripheral neuropathy and suboptimally controlled hypertension for the past three years.  He drinks alcohol daily.  A recent foot examination showed sensation was intact, except for his big toe and second toe on the left foot.  He was advised to wear good foot gear and to be more compliant with medical care.  Dr. Blacklock opined Plaintiff's alleged limitations were partially supported by medical evidence.  Dr. Blacklock's findings were affirmed by James Wright, M.D., on November 16, 2006.  (R. 356).

Plaintiff was seen at EPMHMR on August 7, 2006.  (R. 484-486).  His overall functioning was rated at 10, the highest level.  Plaintiff reported no symptoms and no side effects.  The notes indicate he was not experiencing any panic attacks or depression.  His GAF was rated at 50.

A letter dated August 8, 2006, by EPMHMR nurse Rey Leal states Plaintiff is currently under outpatient treatment and has been receiving services since June 24, 2005.  (R. 327).  He is diagnosed with major depression disorder.  The letter informs that Plaintiff's mental illness has exacerbated, and he is experiencing an increase in symptoms of depression and anxiety which continue to affect his daily functioning.

A progress note by Plaintiff's case manager at EPMHMR states Plaintiff reported being a little depressed and having trouble sleeping.  (R. 446).  He reported a decrease in appetite, and feeling " a little sad."  He was alert and oriented in all spheres.  His mood was neutral, and his affect was appropriate.  It appeared he was adhering to his treatment and medication regime.  He reported taking his medication as prescribing and tolerating it well.  He was to continue treatment.

On August 11, 2006, a Psychiatric Review Technique Form ("PRTF") was completed by Leela Reddy, M.D., a medical consultant.  (R. 330-343).  Dr. Reddy determined Plaintiff has an affective

19

disorder consisting of major depressive disorder. Under the "B" criteria, Dr. Reddy determined Plaintiff has a mild degree of limitation in restriction of activities of daily living; a moderate degree of limitation in maintaining social functioning, a mild degree of limitation in maintaining concentration, persistence and pace, and no episodes of decompensation. Dr. Reddy found that none of the "C" criteria were established. Dr. Reddy concluded that Plaintiff's alleged limitations were not wholly supported by the medical evidence in the file.

A Mental Residual Functional Capacity Assessment also was completed on August 11, 2006, by Dr. Reddy. (R. 352-355). In the category of understanding and memory, Dr. Reddy determined Plaintiff had a moderate limitation in his ability to understand and remember detailed instructions. In the category of sustained concentration and persistence, Dr. Reddy found Plaintiff to be moderately limited in his ability to carry out detailed instructions, moderately limited in his ability to maintain attention and concentration for extended periods, moderately limited in his ability to work in coordination with or proximity to others, and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In the category of social interaction, Dr. Reddy found Plaintiff to be moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors.   She found Plaintiff had no significant limitations in the category of adaptation. Dr. Reddy concluded Plaintiff can understand, remember and carry out detailed, but not complex, instructions. He can make decisions, concentrate for extended periods, accept instructions, make decisions and respond appropriately to changes in work routine. (R. 354).

Plaintiff was seen on September 27, 2006, at San Vicente Clinic for a follow up visit with Dr. Luna. (R. 555-556). He admitted he was not following his diet and was drinking alcohol regularly. The

assessment was uncontrolled diabetes, hypertension, elevated ALT[11] and increased lipids.  Notes indicate the increased ALT might be secondary to "diabetes/fatty liver" versus alcohol use.  Lab work was ordered.  Plaintiff's insulin was increased and hydrochlorothiazide, a diuretic, was prescribed.  That same day, Plaintiff underwent x-rays of his left shoulder that showed mild left acromioclavicular joint osteoarthopathy.  (R. 548).  No significant bony abnormality was found.

On October 30, 2006, Plaintiff was seen at EPMHMR.  (R. 444).  He requested a letter to verify that he had been receiving services and needed to continue receiving services.  He reported feeling well.  He had been compliant with his medication regime and had no complaints.  His overall functioning was rated at 10, the highest level, and he was not experiencing any symptoms of depression.  (R. 481-483).

Plaintiff was seen on January 22, 2007, at EPMHMR.  (R. 477-480).  He reported doing well.  He stated he was eating and sleeping well.  He was not having any panic attacks.  He reported having some rash on both arms and legs off and on for the past year.  His GAF was rated at 50.

On February 1, 2007, a representative of EPMHMR attempted a home visit to update services.  (R. 442). Notes state Plaintiff was not home.

On February 6, 2007, Plaintiff was treated at the emergency room for trauma to his right index finger.  (R. 364-370). An x-ray revealed soft tissue swelling about the distal phalanx, but no fracture.  He returned on February 10, 2007, for follow up. (R. 363).  Notes indicate he had an abscess that had drained two days earlier.  He was to continue taking antibiotics and seek further care if needed.

On February 16, 2007, Plaintiff was seen at EPMHMR.  (R. 440). He stated he was feeling well and that his medications had led to great improvement.  He mentioned having some occasional sadness with a little amount of anxiety.  He was coherent, cooperative and well-groomed.  He was to continue treatment to maintain stability.

---

[11] Alanine transaminase is an enzyme found in the highest amounts in the liver.  Injury to the liver results in the release of this substance into the blood. http://www.nlm.nih.gov/medlineplus/ency/article/003473.htm  (last visited March 29, 2012).

A letter dated March 5, 2007, and signed by Rey Leal, P.N.P. and Dr. Cecilia Garcia, Psychiatrist, states that Plaintiff has been receiving outpatient mental health services from EPMHMR since June 24, 2005. (R. 357). He has been diagnosed with severe recurrent major depression and takes Lexapro, 10 mg., and Trazadone, 50 mg.  The letter further states that due to the nature of Plaintiff's diagnosis, he is unable to secure or maintain gainful employment.

On May 5, 2007, Plaintiff was seen at San Vicente Clinic for a follow up visit.  (R. 552-554). It was noted that he had not been taking his insulin injections for the past six months.  He stopped taking all his medications because "he feels good."  The assessment was poorly controlled diabetes, poorly controlled hypertension and neuropathy. Lab work was ordered, and he was to restart his medications.

Plaintiff met with his case manager at EPMHMR on May 11, 2007.  (R. 439).  He reported he was doing well and taking his medication. He did not feel depressed and was eating well. He stated he was reapplying for SSI. He was oriented and cooperative with fluent speech and good eye contact.

Plaintiff was seen at EPMHMR on May 16, 2007.  (R. 473-476).  He reported mild symptom severity and side effects.  His overall functioning was rated at 8, with 10 being the highest.  He reported doing well, with occasional insomnia, but no depression.  His appetite was increased.  Plaintiff stated he felt the medications were working to control his depression. The notes state, "Medical under control."

On July 31, 2007, Plaintiff was met with his case manager at EPMHMR.  (R. 437).  He stated he had been doing fine. He reported following his medication regimen with no side effects.  He denied any depressive/psychiatric symptoms.  He reported to be eating and sleeping well. He stated he has family support.  He was oriented and cooperative with fluent speech and appropriate mood.  He was to continue with treatment in order to maintain stability.

On August 9, 2007, a Psychiatric Evaluation was completed by Rey Leal, N. P., at EPMHMR.

(R. 529-531).  The report states Plaintiff began treatment in 2001 at which time he was diagnosed with major depressive disorder and anxiety attacks.  His symptoms of anxiety, including anxiety attacks, began in 1997 when he began working the night shift for an electrical company.  In 2000, symptoms of depression began,  and he started  treatment for these symptoms in 2001.  Celexa was prescribed. A couple of years later, he was switched to Lexapro.  He had suicidal ideations in 2001, but Lexapro helped control his anxiety and depression.  He no longer has suicidal thoughts.  He suffers from occasional insomnia and for which he takes Trazodone. Plaintiff's medical history includes diabetes and hypertension.  He denied any other medical conditions.

Upon examination, Plaintiff was alert and oriented with clear speech and good eye contact. His mood was good with appropriate affect.  He was described as having average intelligence with fair insight and judgment.  The assessment was major depressive disorder, severe, without psychotic features.  He was noted to have inadequate social support, no employment and inadequate finances. His GAF was rated at 50.  The plan was to continue with the current treatment.

Notes from EPMHMR dated November 6, 2007, indicate Plaintiff was doing well.  He was not having panic attacks, was not depressed and was sleeping well.  His GAF was rated at 50.  (R. 469-472).

EPMHMR case management notes dated January 28, 2008, state Plaintiff reported he was doing fine.  (R. 431-432).  He was following his medication regime and denied any medication side effects. He stated he rarely felt sad and was eating and sleeping well.  He was oriented in all spheres, cooperative and maintained good eye contact.  He was well dressed and groomed.  He reported he was applying for Social Security benefits.

An  EPMHMR outpatient clinic form dated January 29, 2008, and signed by Rey Leal, N.P., indicates Plaintiff had not had any panic attacks for one year and was not depressed.  (R. 465-468).  His overall functioning was rated at 8, with 10 being the highest, and GAF was rated at 50.  He was to

return to the clinic in 12 weeks.

A note written on a prescription form dated February 2, 2008, signed by Dr. Luna reads: "Mr De La Rosa is 100% totally and permanently disabled. Dx: DM, [illegible] Peripheral neuropathy." (R. 533).

On July 7, 2008, Plaintiff was seen by Dr. Luna for a chief complaint of loss of sensation and severe burning in his feet. (R. 550-551). He had not been taking his insulin. His blood glucose level was 259. He had decreased sensation in his feet. He was to restart insulin. It was noted Plaintiff was unable to climb or participate fully in work.

F. Analysis of Plaintiff's Claims

   1. Substantial Evidence Supports the ALJ's Mental RFC Determination

The ALJ found Plaintiff to be disabled beginning on June 23, 2008, the date his age category changed to an individual of "advanced age." (R. 18). Therefore, the time period at issue in this appeal is from January 15, 2005, the amended alleged onset date, through June 22, 2008. (Doc. 27, p. 2). The ALJ determined that, prior to June 23, 2008, Plaintiff retained the RFC to perform a range of medium work, limited by the ability to understand, remember and carry out detailed, but not complex, instructions. (R. 15). In assessing Plaintiff's RFC, the ALJ further found Plaintiff was able to make decisions, attend and concentrate for extended periods, adequately accept instructions, and respond appropriately to changes in a routine work setting. *Id.*

Plaintiff contends the ALJ's mental RFC finding is not supported by substantial evidence because it does not account for all the mental limitations supported by the record. Specifically, Plaintiff complains it does not account for the moderate limitation in the domain of concentration, persistence and pace found by the ALJ when he rated the degree of limitation in the four broad functional areas. Relying on *Otte v. Commissioner of SSA*, 2010 WL 4363400 *6 (Oct. 18, 2010 N.D. Tex), Report and Recommendation adopted by 2010 WL 4318838 (N.D. Tex. Oct. 27, 2010), Plaintiff argues it was

legal error for the ALJ to find that a moderate limitation in concentration, persistence and pace amounts to a finding of the ability to perform detailed, but not complex tasks. (Doc. 27, p. 5).

The Commissioner argues *Otte* is inapplicable here. The Court agrees. In *Otte*, the ALJ erred because, assuming the role of a vocational expert, he found the claimant's moderate limitation in his ability to understand, remember and carry out detailed instructions resulted in a mental RFC to perform unskilled work. Without undertaking the required function-by-function mental RFC analysis, the ALJ in *Otte* incorrectly concluded the claimant's mental limitations translated to the skill level of occupations he could perform, rather than the complexity of the tasks he could perform.

In Plaintiff's case, the ALJ did not translate Plaintiff's mental limitation in a functional area into a skill level of occupations absent any function-by-function analysis. The ALJ specifically found Plaintiff was able to "understand, remember and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods, adequately accept instructions; make decisions; attend and concentrate for extended periods; adequately accept instructions; and respond appropriately to changes in a routine work setting." (R. 15, 16). The ALJ based the mental RFC assessment on all the evidence, including a function-by-function analysis of Plaintiff's limitations by Dr. Reddy. (R. 352-353). See *Morgan v. Comm'r of SSA*, 2011 WL 4528423 * 7 (N.D. Tex. Sept. 30, 2011) (distinguishing *Otte* where ALJ explained claimant's mental abilities based on all relevant medical evidence). Dr. Reddy reviewed Plaintiff's medical records and concluded Plaintiff retained the mental RFC to "understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, make decisions and respond appropriately to changes in work setting." (R. 354).

Additionally, in posing his hypothetical to the VE, the ALJ included the same mental limitations

he ultimately found when determining Plaintiff's RFC.[12]  In response, the VE identified three jobs that such a hypothetical person could perform: linen room attendant, laundry worker and hand packer.  (R. 42-43).   The VE indicated the identified jobs involved "working with things rather than people."  (R. 43).  The ALJ relied on the VE's testimony in concluding Plaintiff was not disabled during the relevant time period.  Importantly, Plaintiff does not explain how the jobs identified by the VE exceed his mental RFC.

Plaintiff also contends the ALJ's findings are contradicted by the opinion of Plaintiff's treating psychiatrist, Dr. Cecilia Garcia, who opined on March 5, 2007, that Plaintiff's mental impairments prevent him from securing or maintaining gainful employment.  (R. 358).  Plaintiff argues the ALJ failed to evaluate, according to the criteria found in sections 404.1527(d) and 416.927(d) of the regulations,[13] the treating psychiatrist's opinion, which is uncontradicted by an examining source.  Applying the factors, Plaintiff argues Dr. Garcia's opinion should have been given controlling weight because he has been treated for his mental impairment by Dr. Garcia, a specialist in psychiatry, since June 2005, and Dr. Garcia's opinion is supported by the opinion of psychiatric nurse practitioner Ray Leal, as well as Plaintiff's consistent GAF scores of 40 to 50.[14]

Ordinarily, the opinions, diagnoses and medical evidence of a treating physician who is familiar

---

[12] The ALJ asked the VE to assume the hypothetical individual "can understand, remember and carry out detailed, but not complex, instructions, can make decisions and concentrate for extended periods of time, get instructions, make decisions, and respond appropriately to changes in routine work settings."  (R. 42).

[13] The criteria include: (1) the doctor's length of treatment and frequency of examination of the claimant; (2) the nature and extent of the treating relationship; (3) the support of the doctor's opinion afforded by the medical evidence of record; (4) the consistency of the opinion with the record as a whole; (5) the doctor's specialization, if any, and (6) "other factors" that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011).

[14] The record shows Plaintiff's GAF scores included a one-time low of 48 and a one-time high of 55.  Otherwise, his GAF was consistently rated at 50, even when the accompanying notes showed he was functioning at a high level and experiencing no psychiatric symptoms.

with the patient's condition, treatment and responses should be accorded considerable weight in determining disability. *Greenspan v. Shalala*, 38 F.3d at 237. However, the opinions of treating physicians are far from conclusive. *Id.* The ALJ has the sole responsibility for determining whether the claimant is disabled. *Id.* The ALJ is entitled to assess the credibility of the expert witnesses, as well as the lay witnesses. *Id.* Accordingly, the ALJ may give a treating physician's opinion less weight, little weight or even no weight when the statements are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or are otherwise not supported by the evidence. *Id.*; *Spellman v. Shalala*, 1 F.3d at 364-65 (opinion of treating physician not given controlling weight when it is inconsistent with other substantial evidence in the record).

In his written opinion, the ALJ stated he had considered the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (R. 15). He noted Plaintiff had received ongoing outpatient treatment from EPMHMR during the relevant time period. (R. 16). After noting numerous times during the relevant years of treatment when Plaintiff was described as asymptomatic, having no complaints, and doing well, without side effects from his medications which were helping him greatly, the ALJ concluded the March 2007 letter, countersigned by Dr. C. Garcia, stating Plaintiff had been unable to secure or maintain employment due to his condition and medications, stood in contrast to the actual treatment records.[15]

Although the ALJ did not expressly list them, he implicitly considered all the factors in 20 C.F.R. §§ 404.1527(d) and 416.927(d) before determining that Dr. Garcia's opinion should be afforded very little evidentiary weight because it was inconsistent with other substantial evidence in the record.

---

[15] The ALJ similarly determined a January 2006 letter signed by Nurse Leal stating Plaintiff cannot hold employment due to the complexity and severity of his symptoms and medication side effects should be afforded very little evidentiary weight because it was very inconsistent with Plaintiff's actual treatment records. Although a nurse practitioner is not an "acceptable medical source" for a "medical opinion" under 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2), information from a nurse practitioner is treated as information from "other sources" which may be considered pursuant to 20 C.F.R. §§ 404.1513(d) and 416.913(d).

He also properly gave little weight to Nurse Leal's opinion. Finally, Plaintiff's GAF scores, which reflect a lower level of functioning than supported by the accompanying detailed treatment notes, are not entitled to significant weight as an indicator of disability. *Hill v. Astrue*, 2009 WL 2901530 *7(S.D. Tex. Sept. 1, 2009) (noting the GAF scale, while potentially relevant, does not directly correlate to an individual's ability or inability to work). The Commissioner has specifically declined to endorse the GAF scale for use in the disability programs. *See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746, 50,764-65, 2000 WL 1173632 (Aug. 21, 2000).

Plaintiff further argues that, even if the ALJ properly credited Dr. Reddy's opinion over Dr. Garcia's opinion, the ALJ's finding that Plaintiff's mental impairment results in only a mild limitation in social functioning is not supported by the record because Dr. Reddy found Plaintiff had a moderate limitation in social functioning. Plaintiff does not cite any authority or offer any explanation as to why this difference renders the ALJ's RFC determination faulty. Plaintiff also points out Dr. Reddy found he has a moderate limitation in his ability to work in coordination or proximity with others without being distracted by them, and a moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors. Plaintiff does not explain how the evidence shows his mental RFC is more limited than the limitations imposed by the ALJ. Rather, Plaintiff's arguments turn on inconsistencies between Dr. Reddy's check-box findings and the ALJ's articulation of Plaintiff's mental RFC. After explaining his reasons for affording little evidentiary weight to the opinions of Dr. Garcia and Nurse Leal that Plaintiff was unable to work due to his mental problems, the ALJ stated he was giving controlling weight to the opinions of the state agency medical consultants who determined Plaintiff was able to work. As explained above, the ALJ's mental RFC tracked Dr. Reddy's conclusion, and it finds substantial support in the record.

The task of weighing the evidence is the province of the ALJ. *Chambliss v. Massanari*, 269

F.3d 520, 523 (5th Cir. 2001). The task of the Court is to determine if there is substantial evidence in the record that supports the ALJ's decision. *Id.*, citing *Greenspan*, 38 F.3d at 240. As substantial evidence supports the ALJ's mental RFC assessment, it must be affirmed.

### 2. The ALJ Properly Considered Plaintiff's Diabetic Neuropathy

Citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), Plaintiff complains the ALJ failed to evaluate and consider the severity and limiting effects of his diabetic neuropathy. According to Plaintiff, this impairment should have been found severe, and the ALJ should have included resulting functional limitations in the RFC finding. Plaintiff argues it is unreasonable to conclude that he is able to perform the walking or standing requirements of either light or medium work due to his bilateral diabetic neuropathy as evidenced by sensory loss in both feet. In support, Plaintiff cites to medical progress notes from October 2005, (R. 282, 284, 299, 567); December 2005, (R. 300)[16]; June 2006, (R. 273); and, December 2008. (R. 281).

At step two, the ALJ determines whether an impairment is severe, irrespective of the claimant's age, education or work experience. 20 C.F.R. §§ 416.920(a)(4)(ii) & 416.920(c) (2011). Pursuant to the Commissioner's regulations, a severe impairment is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c) (2011). The Fifth Circuit, however, has held that a literal application of this regulation would be inconsistent with the Social Security Act because it would deny benefits to individuals who are disabled under the statute. *Stone*, 752 F.2d at 1104-05. Accordingly, in this Circuit, an impairment is not severe "only if it is a slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Stone*, 752 F.2d at 1101, quoting *Estran v. Heckler*,

---

[16] Page 300 contains the results of the consultation with Dr. Velasquez on November 2, 2005.

745 F.2d 340, 341 (5th  Cir. 1984) (citations omitted).

As the ALJ observed, a diabetic foot screen in October 2005 showed some loss of protective sensation in Plaintiff's feet. (R. 281-82). The records show Plaintiff was referred to Dr. Velasquez for evaluation and treatment regarding complaints of loss of sensation to the top two-thirds portion of both feet and uncontrolled diabetes for the past two to three years due to noncompliance. (R. 299-301). On November 2, 2005, Dr. Velasquez assessed diabetic neuropathy. (R. 299-300).  Diabetic foot care education was given and high top supportive footwear was recommended.  There were no functional limitations or restrictions imposed by Dr. Velasquez.  Plaintiff was to undergo an MRI of his lower left extremity and return for followup.  The record does not indicate whether the recommended MRI was performed, and there are no other treatment records from Dr. Velasquez.

On March 7, 2006, a foot exam revealed sensation was intact, except for the big toe and second toe of the left foot. (R. 276 ). At that time, Plaintiff's blood glucose level was 429, and it was noted he had been out of medication for three days. *Id.* The assessment was uncontrolled diabetes with peripheral neuropathy. (R. 277).  On June 20, 2006, Plaintiff complained of his feet "hurting and tingling." (R. 272).  His fasting blood glucose level was 259. *Id.* The assessment was poorly controlled diabetes.  Neuropathy was noted, and Plaintiff's insulin dosage was increased. (R. 273). Plaintiff does not point to any objective medical records that document worsening bilateral foot neuropathy in 2007 or 2008.  Nor does Plaintiff point to any evidence of functional limitations or restrictions that were imposed by any treating source due to his diagnosed neuropathy.  Diagnosis of a condition, by itself, is not evidence of a functional limitation. *Brock v. Astrue*, 2011 WL 4348305 (N.D. Tex. Sept. 16, 2011).

In evaluating Plaintiff's diabetic neuropathy, the ALJ addressed the evidence, including

Plaintiff's hearing testimony,[17] the treatment records, and a note on a prescription pad dated February 2, 2008, from Dr. Luna describing Plaintiff as disabled due to peripheral neuropathy. The ALJ cited to Plaintiff's testimony that his hands and feet did not work well due to diabetes. (R. 15, 35). He also noted Plaintiff's testimony that he was able to walk no more than one-half block, stand for two to two and a half hours with pain, sit for about twenty minutes, and lift thirty pounds. (R. 16). The ALJ noted that, although Plaintiff testified he could only sit for twenty minutes, he sat through the one hour hearing without evident discomfort. *Id.* The ALJ found Plaintiff's statements regarding the limiting effects of his impairments were not credible prior to June 23, 2008, to the extent that they are inconsistent with the ALJ's finding of an RFC for medium work. *Id.*

The ALJ stated Plaintiff had "incurred some loss of protective sensation in his feet, but has not reported pain or weakness." The ALJ further noted upper extremity problems were not reflected in the medical evidence.[18]  (R. 16).  The ALJ correctly concluded the treatment records from San Vicente Clinic simply did not document the presence of disabling physical limitations or the type of restrictions expressed in Plaintiff's hearing testimony.  *Id.*  In finding Plaintiff capable of work at the medium exertional level, the ALJ considered Plaintiff's diabetic neuropathy and it's limiting effects. Additionally, the Court notes the ALJ relied on the findings of Dr. Blacklock, who reviewed Plaintiff's medical records and history of diabetic neuropathy, but nonetheless found Plaintiff capable of medium work.

The ALJ also noted Plaintiff's treatment records were noteworthy for non-compliance, advisories to stop alcohol use and recommendations that he comply with treatment.  It is well

---

[17] Plaintiff testified, " ... with the diabetes, my feet don't help me anymore. I'm not able to walk. I'm not able to climb stairs ..." (R. 35).  He also stated, "My problem is that my hands don't respond."  *Id.*

[18] It appears Plaintiff has abandoned any claim regarding diabetic neuropathy in his upper extremities.

established that a claimant's failure to comply with a prescribed regimen of treatment constitutes grounds for denying disability. *Johnson v. Sullivan*, 894 F.2d 683, 695 n.4 (5th Cir. 1990); 20 C.F.R. §§ 404.1530(a) and 416.930(a) ( claimant who does not follow prescribed treatment will not receive benefits if treatment would allow claimant to return to work); 20 C.F.R. §§ 404.1530(b) and 416.930(b) (claimant who fails to provide good reason for not following prescribed treatment will not be deemed disabled and will not receive benefits).

The record shows Plaintiff's neuropathy is a complication of his uncontrolled diabetes. Plaintiff does not point to any evidence of functional limitations or restrictions that were imposed due to neuropathy. Accordingly, Plaintiff has not shown the ALJ erred in failing to find it severe under *Stone*. Moreover, in reaching his decision, the ALJ considered the limiting effects of all of Plaintiff's impairments, severe and non-severe. There is no reversible error on this ground.

## CONCLUSION

It is therefore ORDERED that the decision of the Commissioner be, and it is hereby, AFFIRMED.

SIGNED and ENTERED this 29th day of March, 2012.

RICHARD P. MESA
UNITED STATES MAGISTRATE JUDGE